1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

7   DARCY BURSING,                          )
8                  Plaintiff,               )        Case No.  2:12-cv-00434-GMN-GWF
                                            )
9   vs.                                     )        **FINDINGS AND**
                                            )        **RECOMMENDATION**
10  MICHAEL J. ASTRUE, Commissioner,        )
    Social Security Administration,         )
11                                          )
12                 Defendant.               )
    _____)

13           This case involves judicial review of the administrative action by the Commissioner of

14   Social Security denying Plaintiff Darcy Burton's claim for disability benefits under Title II of the

15   Social Security Act.  Plaintiff's Complaint (#1) was filed on March 15, 2012.  Defendant's Answer

16   (#6) was filed on September 11, 2012.  Plaintiff filed his Motion to Remand Administrative

17   Decision of the Commissioner of Social Security (#16) on November 8, 2012.  The Commissioner

18   of Social Security filed his Cross-Motion for Summary Judgment and Memorandum in Support

19   Thereof and Opposition to Plaintiff's Motion to Remand (#17) on December 7, 2012.  Plaintiff

20   filed his Reply in Support of Motion for Summary Judgment and Opposition to Defendant's Cross-

21   Motion for Summary Judgment (#21) on January 14, 2013.

22                                    **BACKGROUND**

23       **A.      Procedural History**

24           Plaintiff Darcy Bursing seeks judicial review of the Administrative Law Judge's ("ALJ")

25   decision dated July 1, 2010.  A.R. 19-28.  The issue before the Court is whether the Plaintiff was

26   disabled from his alleged onset date of disability:  September 14, 2003.  On June 23, 2008, Plaintiff

27   protectively filed an application for a period of disability and disability insurance benefits.  The

28   agency denied Plaintiff's application initially on August 28, 2008, and upon reconsideration on

April 8, 2009. A.R. 78-87, 89-95. On May 18, 2009, Plaintiff requested a hearing before an ALJ. A.R. 96. The video hearing was conducted on May 20, 2010 and Plaintiff appeared and testified. A.R. 43-73. A vocational expert, Frances Summers, also testified. A.R. 66-67. The ALJ concluded that Plaintiff was not disabled from the alleged onset date of September 14, 2003 through the date of the decision. A.R. 19-28. Plaintiff's request for review by the Appeals Council was denied. A.R. 1-4. He then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned for a report of findings and recommendations pursuant to 28 U.S.C. §§ 636 (b)(1)(B) and (C).

### B.    Factual Background

Plaintiff Darcy Bursing was 50 years old at the time of the hearing before the ALJ on May 20, 2010. A.R. 51. He is a high school graduate. His past work includes working as a bicycle newspaper deliverer, a housekeeping cleaner and an automobile service station attendant. A.R. 67-68. Mr. Bursing testified at the hearing that he had delivered newspapers for the preceding two years and five months and worked about two hours per day. He testified that he earned about $180.00 per month as a newspaper deliverer. A.R. 51-52.

Mr. Bursing is an admitted long term alcoholic. He claims that he suffers from chronic, severe body pain which he believes is due to fibromyalgia caused by his addiction to alcohol. A.R. 52. At the hearing, he described his symptoms as follows:

> My muscles are very weak and very -- they don't convert energy, they -- they're very -- they burn all the time, they have burning sensations and I have a multitude of symptoms, like a lot of times I'll have -- because like the gravity is trying to pull my insides out through -- down to the earth, and weather has very hard on me when it gets cold out, like when it's snow, my bones feel like they're made out of metal and my tongue gets really hard and it feels like it's made out of metal and it's so bad I can almost -- like I could taste the steel. It tastes like steel.
> . . .
> My -- my muscles are -- are so depleted, so -- in such bad shape I can barely -- I can -- I can walk short distances, but I cannot -- I couldn't walk a mile, I mean if I forced myself to I probably could, but by the end -- by the time I got done I wasn't be standing up, I'd have to sit down and I might even be calling an ambulance. Not too long --
> . . .
> My -- my concentration is bad, I have short term memory loss, especially under pressure, I can't -- when the anxiety starts to kick in it kicks in the adrenaline and the adrenalin goes into my muscles and

2

really bring me down fast and hard.  My muscles are so wasted from
the alcohol that's dehydrated me and dried my system out bad and
that's why I --

A.R. 53-54.

Mr. Bursing testified that he has never undergone mental health counseling and has not received treatment for drug or alcohol abuse, other than going through a diversion program in regard to a DUI charge.  A.R. 55.  He testified that he last consumed alcohol on Super Bowl Sunday 2010 when he drank a 32 ounce beer.  A.R. 56-57.  Mr. Bursing testified that he takes Lyrica for treatment of the fibromyalgia, Ativan to help with anxiety and Imipramine to help with anxiety and the fibromyalgia.  A.R. 56.

The ALJ asked Mr. Bursing if he was capable of dressing himself, performing personal grooming, taking a shower, and similar activities.  Mr. Bursing responded "Yes, it's all very difficult though."  A.R. 58.  The ALJ also asked him if he could perform household chores such as cooking, cleaning, vacuuming, and taking out the trash.  Mr. Bursing likewise responded: "Yes, but it's -- All these things are very difficult and I have to force myself to do most everything I do." A.R. 58.  As far as managing his income and paying his bills, Mr. Bursing stated that he pays the electric bill.  A.R. 58-59.  (At the time of the hearing, Mr. Bursing resided with his girlfriend.)

Mr. Bursing testified that he can go shopping, but always has to hold onto a shopping cart because he can't walk.  He could drive an automobile, but was leery of doing so because of his concentration.  He does not have a driver's license.  He does, however, ride the public bus occasionally and does not have difficulty doing so.  A.R. 58.  The ALJ asked if he used any kind of assistive device like a cane or a walker.  Mr. Bursing testified that he uses his bicycle as a walker. A.R. 59.  Mr. Bursing testified that he could walk up to a mile if he forced himself to do so.  He testified that he can probably stand for an hour, but it would also be very hard.  He stated that he has to lean up against the wall when he takes a shower.  During a normal work day, he believes he could stand and walk for maybe a half hour before needing a break.  A.R. 59-60.  He also indicated that sitting for a half hour is painful.  A.R. 60.  Mr. Bursing testified that he could lift 10, 15 or 20 pounds for a short time.  A.R. 60-61.  Within these limitations, Mr. Bursing testified that he was able to handle his paper route which he performs on a bicycle.  A.R. 61.  Mr. Bursing also testified

that his arms and fingers are constantly numb with pins and needles, and a burning sensation all the time.  He stated that it was painful to hold a pen while writing the letters that he sent to the ALJ. A.R. 61.

Mr. Bursing's girlfriend, Priscilla Davis submitted a Function Report, dated July 27, 2008 (i.e. nearly two years before the hearing), in support of his application for disability benefits.  A.R. 150-157.  In regard to the claimant's daily activities, Ms. Davis stated that Mr. Bursing gets up, eats, helps around the apartment as much as possible; sleeps the rest of the day, eats, and watches television until he falls asleep.  She indicated that it is very painful for him to do anything.  A.R. 150.  She reported that Mr. Bursing has painful sleep and that she can't touch him.  A.R. 151.  Ms. Davis reported that Mr. Bursing had no problem with personal care, i.e. dressing, bathing, hair care, shaving, feeding himself, or using the toilet.  A.R. 151.  He is able to prepare his own meals, but is easily frustrated.  It also takes him longer than normal to prepare food, he can't make up his mind what he wants and he forgets that he is cooking and burns food.  He does not perform much housework and gives up and doesn't finish.  A.R. 152.  Ms. Davis stated that Mr. Bursing goes out once in a while, but that the sun hurts his eyes.  He goes food shopping two times a week.  Mr. Bursing is able to pay bills and handle a savings account.  A.R. 153.  Ms. Davis stated that Mr. Bursing's physical and mental condition was affected by his illness.  He cannot walk sometimes, and can only walk 1/2 of a block before needing to stop and cannot resume walking for 10-15 minutes.  A.R. 155.  Ms. Davis indicated that Mr. Bursing no longer engages in social activities. He cannot pay attention very long and is not good at following spoken instructions.  A.R. 155.  Ms. Davis stated that Mr. Bursing is unable to handle stress and gets easily upset.  A.R. 156.  He gets angry, is unable to concentrate and is very moody.  A.R. 157.

The medical records in the administrative record reveal the following:

On June 5, 2001, Mr. Bursing sought medical treatment for various symptoms at the Beatty Medical Clinic in Beatty Nevada where he was then residing.  A.R. 267-268.  The physician's assistant noted that he was a poor historian and had difficulty completing his thoughts.  A.R. 268. Mr. Bursing was again seen on February 1, 2002 with multiple complaints of pain.  The examiner noted "multiple complaints, interrupted thoughts, would not complete one symptom - jumps to

1  different." A.R. 267.  Mr. Bursing continued to be seen at the Beatty Clinic throughout 2002 and

2  into 2003 during which time he received prescriptions for Ativan.  A.R. 256-266.  On  April 2,

3  2003 Mr. Bursing was described as "circumventing," talking vaguely, appearing anxious and

4  hyperactive.  A.R. 256.  In August 2003, he was diagnosed with alcohol dependence, although a

5  urinalysis was negative.  A.R. 254.  In November 2003, the clinic physician stated that Mr. Bursing

6  was in mild distress and agitated.  He appeared to be self-medicating with alcohol and was

7  diagnosed for anxiety and neuropathy caused by alcohol.  A.R. 251.   Mr. Bursing also reported a

8  high level of stress and anxiety.  A.R. 250.  Mr. Bursing's girlfriend reported that he frequently

9  mentioned killing himself, although he had made no attempt.  The doctor noted that Plaintiff had

10  flight of ideas, pressured speech, circumventing and paranoia.  A.R. 250.

11  In December 2003, Mr. Bursing reported that he thought he might have had a stroke,

12  seizure or heart attack and felt his muscles and nerves were damaged.  A.R. 248.  He had such

13  flight of ideas that it was difficult to get his history.  Therapy with a psychologist or psychiatrist

14  was recommended.  In early January 2004, Mr. Bursing reported that his medication did not work

15  and made his muscles hurt more.  A.R. 247.  Later in January he reported somatic complaints with

16  muscle pain and was obsessing that alcoholism had penetrated his system and was destroying him.

17  A.R. 246.  Mr. Bursing stated that he had been off alcohol, but drank about six beers on New

18  Year's Eve.  His speech was pressured, circumstantial, with poor and vague content.  Between

19  February and July 2004, Mr. Bursing requested and obtained further refills of his Ativan

20  medication.  A.R. 244-245.

21  In September of 2004, Mr. Bursing began treating at La Clinica del Valle medical clinic in

22  Medford Oregon.  A.R. 321.  In October 2004, he reported occasionally smoking and using alcohol.

23  He appeared nervous with reduced eye contact and fidgety.  He was diagnosed with anxiety.  Mr.

24  Bursing continued to drink on weekends to relax.  A.R. 318-319.  He was noted to have "a great

25  deal of trouble trying to remember his history and trying to explain his current situation."  A.R.

26  319.  During a follow-up visit on December 9, 2004, he was observed to be alert and oriented times

27  three and his affect was appropriate.  He was also described as being "a little bit slow in his

28  responses and takes repetition for instructions."  A.R. 318.  A nurse practitioner diagnosed

5

generalized anxiety, history of alcoholism, and a mild cognitive impairment.  She prescribed Klonopin to be refilled on the condition that Mr. Bursing attend weekly AA meetings.  On December 9, 2004, Mr. Bursing reported he had attended AA for the last three weeks and provided proof of attendance.  On that date, the nurse also reported that Mr. Bursing's affect was appropriate and he had good eye contact.  A.R. 316.

On February 4, 2005, Mr. Bursing was seen at the Providence Medford Medical Center emergency room for complaints of anxiety.  He reported that he had been trying to quit drinking, had been doing well for some time, but started experiencing a lot of anxiety and panic and had begun drinking again that day.  A.R. 292.  The emergency physician prescribed Klonopin.  A.R. 293.  Mr. Bursing was thereafter seen at La Clinica del Valle on February 8, 2005 and his Klonopin prescription was refilled.  He signed a chronic controlled substance contract.  He was advised that the Klonopin was potentially addicting, was not the preferred method for treating anxiety, but was being prescribed to him because other medications had failed.  A.R. 315.  In June, 2005, Mr. Bursing again went to the Providence Medford Medical Center emergency department with complaints of anxiety.  A.R. 287.  He reported drinking three to four alcoholic beverages a day.  He was described as "alert and oriented, interactive, does make eye contact, is slightly less than engaged, has a flat effect.  No hypomania is noted.  No pressured speech is noted.  No tangential thought processes are apparent.  The patient does have difficulty describing his anxiety."  A.R. 287.

On July 28, 2005, Mr. Bursing was again seen at  La Clinica del Valle.  He reported that he was still drinking a 24-ounce beer periodically.  A.R. 313.  He also reported that he had recently begun working as a housekeeper in a motel which caused him to miss AA meetings.  The physician assistant stated that she was uncomfortable giving Mr. Bursing Klonopin and instead gave him a prescription for clonidine.  Two days later, Plaintiff saw a different clinic physician and again asked for Klonopin.  A.R. 312.  The doctor told him he was taking too much of the clonazepam medication that had been prescribed by another physician on July 5, 2005 and that it was not a good long-term agent for him.  He prescribed the medication, however, because it seemed to help Plaintiff stay sober.

. . .

On August 31, 2005, Mr. Bursing again sought emergency treatment at Providence Medford Medical Center for anxiety, stating that he was out of medication and under increased stress at work at a new job.  A.R. 282.  When anxious, he felt pressure in his head, his voice became shaky and he had occasional chest tightness.  He had difficulty focusing his thoughts.  He showed poor eye contact, a slightly depressed affect, and occasional tangential thought processes, although he was easily redirected and refocused.  He was diagnosed with anxiety.  A.R. 282-283.

In September 2005, Mr. Bursing asked La Clinica del Valle for a refill of Klonopin. A.R. 310.  He initially said he was not drinking "very much" and then later said he had quit drinking. However, he smelled of alcohol a little bit.  The doctor reviewed his chart and decided that long-term benzodiazepines were not appropriate, instead prescribing Flexeril and Prozac.  On September 21, 2005, Plaintiff went to the Rogue Valley Medical Center emergency room in Medford, Oregon and requested a refill of Klonopin.  A.R. 297.  He was very anxious with slightly rapid speech.  The doctor agreed to give him a prescription of Klonopin for a few days, but directed him to return to La Clinica del Valle for long term medication that would be good for his anxiety.

There are no medical records in the administrative record after September 2005 through August 2006.  A.R. 24.

On August 31, 2006, Mr. Bursing was examined by Dr. Brent Burket at La Clinica del Valle.  A.R. 308.  Mr. Bursing discussed his history of alcoholism and stated that he had become addicted to Ativan.  He reported that he was experiencing withdrawal symptoms, although he stated that he had not had any alcohol for a month and no Ativan for four days.  Dr. Burket prescribed clonidine and Phenergan.  On September 20, 2006, Mr. Bursing reported that he had not used alcohol for over 50 days, but because of his alcoholism, he had pain beginning at his brainstem, involving all of his tendons and blood vessels.  He stated that the pain was so severe that he was actually paralyzed. A.R. 306.  Dr. Burket noted, however, that on physical examination, Mr. Bursing had normal movement, sat up without difficulty and had normal ambulation.  Dr. Burket declined to prescribe medication at that point before further reviewing Mr. Bursing's past medical records and also referred him for physical therapy.

. . .

7

On February 23, 2007, Mr. Bursing reported to La Clinica del Valle that "all of his insides are shot." A.R. 304.  His muscle groups ached all over his body, and more so the past month, although it had been an issue for 15 years.  He felt that being an alcoholic had caused his muscles, tendons, veins, and brain to be decayed and damaged.  He had quit drinking three weeks earlier. The nurse practitioner noted that Mr. Bursing had very poor eye contact and seemed very upset that other practitioners had done nothing to help him.  He seemed to have some mental slowness.  On February 28, 2007, Mr. Bursing reported that he was doing much better.  Under psychological observation, the physician assistant noted that he continued to have very poor eye contact. However, he seemed to be feeling better and was less upset than on the previous visit.  A.R. 303. On April 11, 2007, Mr. Bursing informed the physician assistant that he believed he was suffering from fibromyalgia.  A.R. 302.  The physician assistant noted that Plaintiff continued to have poor eye contact and was very fixated on his condition which he believed may be fibromyalgia.  He was given vitamin, dietary, exercise, and lifestyle suggestions.  A rheumatologic evaluation was offered, but Plaintiff was advised it would be expensive.

There are no medical treatment notes or reports in the administrative record for the period between April 11, 2007 and March 15, 2009.

On March 16, 2009, Mr. Bursing was examined by Dr. Edwin Pearson, a licensed psychologist, at the request of the Oregon Department of Human Services, Seniors and People with Disabilities.  A.R. 352.  Dr. Pearson noted that the results of his evaluation would be used in determining Plaintiff's eligibility for Social Security disability benefits.  Mr. Bursing told Dr. Pearson that both his parents were severe alcoholics.  Id.  He reported diffuse muscle pain.  A.R. 353.  Dr. Pearson noted that Mr. Bursing was quite contradictory in describing his alcohol abuse history.  A.R. 354.  He stated that he was not drinking anymore, yet volunteered that he had four beers during the Super Bowl in 2009.  Although Mr. Bursing said he was absolutely finished with drinking, it did not "ring true" to Dr. Pearson.  Dr. Pearson observed that Mr. Bursing was completely oriented, cooperative and motorically calm.  He physically displayed only a minimal amount of pain behavior, but expressed a great deal of subjective distress when speaking of his health problems.  Dr. Pearson noted that he was not observably depressed or anxious.  He was quite

8

vague in conversational speech and had difficulty at times following the conversational flow and reaching conversational goals.  A.R. 354-355.  He struggled to remember places and dates, often losing track of the thread of the conversation and introducing irrelevant information.  A.R. 355.  He had a tendency to exaggerate the degree of his physical illness.

Dr. Pearson stated that Mr. Bursing scored 29 out of 30 on the Mini-Mental State Examination.  He made one error in delayed recall of a three-word list.  A.R. 355.  Dr. Pearson wrote:

> Although he did appear to have problems with memory throughout the interview, the Mini-Mental State Examination does not reveal significant neurocognitive impairment.  Nevertheless, a weak memory and confused illogical verbalizations during interview were noted.  It is highly unlikely that he was deliberately faking these behaviors.  A neuropsychological assessment would be required to address current cognitive status comprehensively.

> In summary, Darcy is a 49-year-old man who appears to be of no higher than low average general intelligence.  He has had a variety of entry-level work on and off over the course of his adult life, but he says he has not worked in at least three years.  He is a chronic alcoholic who, by his own admission, drank as recently as about a month before meeting with this writer.  He claims he has diffuse muscle pain, which limits physical activity.  This is the primary reason he is applying for disability.  He does appear to have some difficulties with concentration and memory.

> With regard to this individual's capacity to engage in work-related activities, it is the examiner's impression that Darcy would have mild problems understanding and remembering instructions in an entry-level work environment.  He would probably experience mild to moderate problems with pace, persistent and concentration because of his preoccupation with physical discomfort.  No problems in social relations are anticipated.

A.R. 355.

Dr Pearson diagnosed Mr. Bursing as having the following clinical disorders: Axis I. 303.90 Alcohol Dependence, Allegedly in recent remission; 307.89 Pain Disorder Associated with Both Psychological Factors and Medical Condition (Provisional); 294.9 Cognitive Disorder NOS[1] (Rule Out, Secondary to Chronic Alcoholism).  Dr. Pearson deferred a diagnosis under Axis II, Personality disorders.  Under Axis III, he stated that "Claimant reports diffuse muscle pain.  This

---

[1]Not otherwise specified.

9

writer does not have any medical documentation that might offer a medical explanation for this subjective physical discomfort." A.R. 355.

The following day, March 17, 2009, Mr. Bursing was examined by Dr. Daniel Saviers, a physical medicine and rehabilitation specialist at the request of the Oregon Disability Determination Services. A.R. 358. Dr. Saviers noted that Mr. Bursing "has had no formal diagnosis of fibromyalgia but has self diagnosed himself with fibromyalgia and alcoholism." Mr. Bursing reported symptoms of total body muscle tenderness, that he could hardly walk because his muscles are "shot" and that the symptoms had been ongoing for 15 years. Mr. Bursing also informed Dr. Saviers that he had consumed a half-case of beer every day for about 15 years. He reported that he stopped drinking two years previously, but continued to drink wine and had maintained total abstinence for a "few months." Mr. Bursing reported that he last worked in 2005 as a housekeeper and that muscle aches forced him to quit working. He told Dr. Saviers that he could stand for 15 minutes, walk a block, and perhaps walk a mile if he forced himself. He stated that he could lift 50-100 pounds and dress and bathe himself. Mr. Bursing stated that he does not drive because he has poor concentration, short term memory loss and vision impairments.

On examination, Dr. Saviers noted that Mr. Bursing's affect was somewhat flat and he took quite a long time to answer questions. He was somewhat vague about his history and took a great deal of effort. A.R. 358-359. Mr. Bursing had an essentially normal physical examination in terms of mobility, range of motion and motor strength. Dr. Saviers noted that "[s]ensation slightly diminished to pinprick entire left side." A.R. 359. Dr. Saviers also stated that "[a]ll of the tender points for fibromyalgia were palpated. He had one pectoral muscle that was discretely tender. Other areas did not elicit a pain response. When asked about this, the patient stated that he had 'numbed his whole body' so that he was not feeling pain. Control points including the mastoid and the great toenail initiated 5/10 pain." A.R. 359. Dr. Saviers' impression was: 1. Total body pain but no definite diagnosis noted. 2. History of alcoholism and tobaccoism. Under discussion, Dr. Saviers stated: "The patient's examination is relatively benign. This is not consistent with fibromyalgia. He has no obvious joint abnormalities. He does not require assistive device for ambulation. Question whether he may have underlying psychiatric disorder as the examination is

very benign." A.R. 359.

The agency psychologist, Kordell Kennemer, who reviewed Dr. Pearson's report on April 1, 2009, stated that "Dr. Pearson opined that the claimant without mild problems understanding and remembering instructions and entry-level work environment and would probably experience mild to moderate problems with pace, persistence and concentration because of his preoccupation with physical discomfort." A.R. 372. The agency psychologist stated that Mr. Bursing had the following medically determinable impairments (MDI); alcohol dependence, allegedly in remission; pain disorder associated with both psychological factors and general medical condition; and cognitive disorder NOS. Nonsevere. A.R. 372. Agency physician, Neal E. Berner, M.D. reviewed Dr. Saviers' report on April 6, 2009 and concluded that Mr. Bursing has the following medically determinable impairment (MDI): total body pain; chronic pain. Nonsevere. A.R. 374.

In July 2009, Mr. Bursing was taken to the Rogue Valley Medical Center Emergency Department by the police after he had reportedly made a statement to his girlfriend about suicide. A.R. 380-382. Mr. Bursing denied any intention to harm himself. A.R. 380. Under "Psychiatric Examination," the physician stated: "The patient will not make eye contact during history. The patient is very tangential, poor historian who frequently gets off track and continues to perseverate on pain issues. Affect is depressed. Intellect is average. Judgment and insight are very poor." A.R. 380. On September 17, 2009, Plaintiff went to Providence Medford Medical Center. A.R. 388. The emergency room physician also noted that Mr. Bursing was "a very tangential difficult historian who gets very frustrated with my questioning with regard to his problems, repeated asking me to try and 'figure it out,' but repeated stating that his prior alcoholism has ruined his nervous system." A.R. 388-389.

On September 25, 2009, Mr. Bursing saw Peter Hutchinson, M.D. at the PMG/Doctors Clinic in Medford, Oregon. A.R. 401. Under "physical examination," Dr. Hutchinson stated that Mr. Bursing was "a well developed gentleman who is a very bad historian, displays a lot of difficulty sticking to a specific line of questioning and ... rambles about [insignificant] problems when allowed to talk freely. I suspect he has flight of ideas problem." A.R. 402. Dr. Hutchinson diagnosed fibromyalgia and alcohol abuse in remission. He also suspected that Mr. Bursing suffers

11

from disorganized schizophrenia and stated that he would endeavor to have Mr. Bursing see a psychiatrist." A.R. 403. On October 23, 2009, Dr. Hutchinson made a diagnosis of disorganized schizophrenia chronic condition, although there is no indication that he obtained a psychiatric consultation. A.R. 399. Dr. Hutchinson again saw Mr. Bursing on November 23, 2009 and repeated the same diagnoses. A.R. 396-397.

During the hearing, the ALJ also examined the vocational expert (VE), Frances Summers. The VE testified that Mr. Bursing's current work as a newspaper deliverer was classified as light duty, unskilled work. His past work as a housekeeping cleaner was also classified as light duty, unskilled work. His past work as an automobile service station attendant was classified as light duty, semi-skilled work. A.R. 68. The ALJ concluded that Mr. Bursing's previous work as a service station attendant was too remote and that he would exclude that as past relevant work. He also concluded that his part-time work as a newspaper deliverer did not qualify as substantial gainful activity because "he's not earning anywhere near SGA." A.R. 68.

The ALJ asked the VE to assume a hypothetical person with the same age, education and vocational background as Mr. Bursing, and that the person fit into the younger age category when the case began, but that he now was closely approaching the advanced age category. The ALJ also asked the VE to assume that the person is capable of light work, can lift 20 pounds occasionally and 10 pounds frequently, can stand and walk six hours during an eight hour work day, can sit six hours with normal breaks that allow him to change his position for physical comfort. The person should also have no exposure to hazards because of the potential for relapse into drug or alcohol abuse. A.R. 69. The VE testified that the person would not be able to perform Mr. Bursing's past work as a housekeeping cleaner because that work does not allow for the sit/stand option. A.R. 69-70. The VE testified the person with such limitations could perform light duty jobs that exist in significant numbers in the national economy, including information clerk, office helper, or assembler of small products. A.R. 70.

### C.    Administrative Law Judge's July 1, 2010 Decision

To qualify for disability benefits under the Social Security Act, a claimant must show that:
. . .

12

(a)   he/she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less that twelve months; and

(b)   the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.

*Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A).

Social Security disability claims are evaluated under a five-step sequential evaluation procedure. *See* 20 C.F.R. § 404.1520(a)-(f). *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). The claimant carries the burden with respect to steps one through four. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). If a claimant is found to be disabled or not disabled, at any point during the process, then no further assessment is necessary. 20 C.F.R. § 404.1520(a).

Under the first step, the Secretary determines whether a claimant is currently engaged in substantial gainful activity. *Id.* § 416.920(b). If so, the claimant is not considered disabled. *Id.* § 404.1520(b). Second, the Secretary determines whether the claimant's impairment is severe. *Id.* § 416.920(c). If the impairment is not severe, the claimant is not considered disabled. *Id.* § 404.152(c). Third, the claimant's impairment is compared to the "List of Impairments" found at 20 C.F.R. § 404, Subpt. P, App. 1. The claimant will be found disabled if the claimant's impairment meets or equals a listed impairment. *Id.* § 404.1520(d). If a listed impairment is not met or equaled, the fourth inquiry is whether the claimant can perform past relevant work. *Id.* § 416.920(e). If the claimant can engage in past relevant work, then no disability exists. *Id.* § 404.1520(e). If the claimant cannot perform past relevant work, the Secretary has the burden to prove the fifth and final step by demonstrating that the claimant is able to perform other kinds of work. *Id.* § 404.1520(f). If the Secretary cannot meet his or her burden, the claimant is entitled to disability benefits. *Id.* § 404.1520(a).

The ALJ found that Mr. Bursing met the insured status requirements of the Social Security Act through March 31, 2009. He also found that Mr. Bursing had not engaged in substantial gainful activity since September 14, 2003. He stated that Plaintiff's earnings for his newspaper delivery route did not rise to the level of substantial gainful activity. A.R. 21. The ALJ found that

13

1   Mr. Bursing had the following medically determinable impairments: cognitive disorder NOS,

2   somatoform disorder, and alcohol dependence in recent remission (20 CFR 404,1521 *et seq.* and

3   416.921 *et seq.*).  He further found that Plaintiff does not have an impairment or combination of

4   impairments that has or is expected to significantly limit his ability to perform basic work activities

5   for 12 consecutive months, and that he therefore does not have a severe impairment or combination

6   of impairments.  (20 CFR 404,1521 *et seq.* and 416.921 *et seq.*)  A.R. 21.

7        The ALJ rejected the September 2009 diagnosis of Dr. Peter Hutchinson that Plaintiff

8   suffers from fibromyalgia.  The ALJ noted that Dr. Hutchinson did not perform the appropriate

9   testing to make such a diagnosis whereas Dr. Saviers did.  Because there was only a six month

10  period between the doctors' evaluations, the ALJ accepted the findings of Dr. Saviers as the most

11  accurate based on the diagnostic criteria.  A.R. 27.

12       In finding that Plaintiff's impairments were not severe, the ALJ stated that although the

13  impairments could produce some of the alleged symptoms, the statements of the claimant and his

14  third party supporters concerning the intensity, persistence and limiting effects of his symptoms

15  were not credible to the extent they were inconsistent with findings that the claimant had no severe

16  impairment or combination of impairments.  A.R. 23.  The ALJ noted that during the time claimant

17  treated at the Beatty Medical Clinic, he was diagnosed only with somatic complaints.  Although

18  claimant was referred to mental health on several occasions, he was reluctant to follow up.  He was

19  also reluctant in regard to trying SSRI's (anti-depressant medications).  The ALJ noted that "[i]n

20  general, the claimant was rarely evaluated or examined through this clinic, did not receive

21  counseling services and only continued to appear in order to receive his prescription for Ativan."

22  A.R. 23.

23       The ALJ noted a similar pattern in Mr. Bursing's treatment with La Clinica del Valle, in

24  Medford, Oregon.  After the clinic switched his prescription from Ativan to Klonopin, which Mr.

25  Bursing stated helped him control his anxiety and remain sober, he continued to engage in alcohol

26  use and when the clinic would not prescribe Klonopin to him, he would seek it at emergency

27  rooms.  The ALJ noted that Mr. Bursing's complaints of severe pain did not correlate to his

28  unremarkable physical examinations.  A.R. 24.

1    In summarizing Dr. Pearson's March 16, 2009 report, the ALJ noted that Dr. Pearson found

2    the claimant to be completely oriented, cooperative and calm.  Dr. Pearson did not observe

3    significant pain behaviors during the evaluation.  He noted that Dr. Pearson remarked that claimant

4    displayed some difficulty following the conversational flow and reaching conversational goals.

5    "Despite this, the claimant scored 29/30 on the Mini-Mental Status Examination . . . .  Overall, Dr.

6    Pearson determined that the claimant did have mild difficulty in his concentration, persistence, and

7    pace secondary to his preoccupation with his alleged physical discomfort."  A.R. 25.   The ALJ also

8    summarized the findings of Dr. Saviers' rheumatologic evaluation and his conclusion that the

9    claimant did not meet the diagnostic criteria for fibromyalgia and that there was no definitive

10   diagnosis to explain the claimant's subjective complaints.  A.R. 25.  In summarizing the records of

11   Dr. Peter Hutchinson, the ALJ noted that "[d]espite only finding positive tender points in his upper

12   and lower back on physical examination, Dr. Hutchinson assessed the claimant as having

13   fibromyalgia and suspected that he also had disorganized schizophrenia."  A.R. 26.

14   Based on the record as a whole, the ALJ found Mr. Bursing's statements and allegations

15   less than fully credible.  The claimant was less than forthcoming with medical providers and

16   mislead them regarding the extent and recency of his alcohol abuse.  The claimant was unable to

17   provide details about his chronic, diffuse pain symptoms.  He refused patient assistance for medical

18   services and he stopped taking medication, which he now needs, because he did not believe it was

19   providing any benefits.  The ALJ also noted that the claimant's presentation has varied, in that

20   sometimes he alleged no physical complaints and only mental health symptoms, and at other times

21   the opposite.  The ALJ also found that Mr. Bursing's ability to perform as a part-time paper

22   delivery person contradicts the severity of the physical limitations he has reported.  The ALJ again

23   noted that despite his subjective complaints, multiple providers observed that the claimant

24   displayed very few pain behaviors during evaluation.  A.R. 26.  The ALJ also found the claimant's

25   behavior suspect for drug seeking behavior based on his conduct in asking different providers to

26   prescribe Ativan or Klonopin after other providers refused to prescribe those drugs.  A.R. 27.  The

27   ALJ gave some weight to the statement of claimant's girlfriend, but only to the extent consistent

28   with his decision, because she appeared to parrot the claimant's statements without providing her

own observations of his behaviors.  A.R. 27.

Because Mr. Bursing had medically determinable mental impairments, the ALJ considered the four broad functional areas for evaluating mental disorders in the disability regulations.  20 CFR, Part 404 Subpart P, Appendix 1.  These four broad functional areas are known as the "paragraph B" criteria.  Under the first functional area, activities of daily living, the ALJ found that Mr. Bursing had no limitation.  Under the second functional area, social functioning, he found that he had only mild limitation.  Under the third functional area, concentration, persistence and pace, he again found only mid limitation based on Dr. Pearson's report.  Under the fourth functional area, episodes of decompensation, he found that the claimant has experienced no episodes of decompensation which have been of extended duration.  A.R. 27-28.  The ALJ concluded that Mr. Bursing's medically determinable impairments were non-severe, and he was, therefore, not disabled at the second stage of sequential disability evaluation process.  A.R. 28.

## DISCUSSION

### I.      Standard of Review

A federal court's review of an ALJ's decision is limited to determining only (1) whether the ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper legal standards.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991).  The Ninth Circuit has defined substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal. 2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001).  The Court must look to the record as a whole and consider both adverse and supporting evidence.  *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).  Where the factual findings of the Commissioner of Social Security are supported by substantial evidence, the District Court must accept them as conclusive.  42 U.S.C. § 405(g).  Hence, where the evidence may be open to more than one rational interpretation, the Court is required to uphold the decision.  *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)).  *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  The court

1    may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal

2    or affirmation of the ALJ's decision. *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453,

3    1457 (9th Cir. 1995).

4         It is incumbent on the ALJ to make specific findings so that the court need not speculate as

5    to the findings. *Lewin*, 654 F.2d at 635 (citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir.

6    1974)).  In order to enable the court to properly determine whether the Commissioner's decision is

7    supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical

8    as feasible and, where appropriate, should include a statement of subordinate factual foundations on

9    which the ultimate factual conclusions are based." *Lewin*, 654 F.2d at 635.

10        In reviewing the administrative decision, the District Court has the power to enter "a

11   judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security,

12   with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  In the alternative, the

13   District Court "may at any time order additional evidence to be taken before the Commissioner of

14   Social Security, but only upon a showing that there is new evidence which is material and that there

15   is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

16        **II.     Burden of Proof**

17        The claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179,

18   182 (9th Cir. 1995), *cert. denied*, 517 U.S. 1122 (1996).  To meet this burden, a claimant must

19   demonstrate an "inability to engage in any substantial gainful activity by reason of any medically

20   determinable physical or mental impairment which can be expected . . . to last for a continuous

21   period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  If the claimant establishes an

22   inability to perform his or her prior work, the burden shifts to the Commissioner to show that the

23   claimant can perform other substantial gainful work that exists in the national economy. *Batson*,

24   157 F.3d at 721.

25        The ALJ, however, has an independent duty to fully and fairly develop the record and to

26   assure that the claimant's interests are considered. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th

27   Cir. 2001).  This duty extends to represented and unrepresented claimants.  Where the claimant is

28   unrepresented, as Mr. Bursing was during the administrative proceedings, "the ALJ must be

especially diligent in exploring for all relevant facts.  The ALJ's duty to fully develop the record is also heightened where the claimant may be mentally ill and thus unable to protect his own interests. *Id.*

### III.   Analysis of the Plaintiff's Alleged Disability

The ALJ found that Plaintiff had the following medically determinable impairments: cognitive disorder NOS, somatoform disorder, and alcohol dependence in recent remission.  The ALJ rejected the diagnosis of Plaintiff's treating physician, Dr. Hutchinson, that Plaintiff suffers from fibromyalgia and disorganized schizophrenia.  The ALJ also found that Plaintiff's medically determinable impairments are not severe.  The ALJ based this conclusion, in part, on his finding that Plaintiff's statements and allegations were less than credible, and, in part, on Dr. Pearson's evaluation of Plaintiff's mental impairments.

### A.   Whether the ALJ Erred in Rejecting the Treating Physician's Diagnosis of Fibromyalgia.

A treating physician's opinion is entitled to ''substantial weight.''  *Bray v. Commissioner*, 554 F.3d 1219, 1228 (9th Cir. 2008), citing *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).  When evidence in the record contradicts the opinion of a treating physician, the ALJ must present ''specific and legitimate reasons'' for discounting the treating physician's opinion, supported by substantial evidence.  The ALJ is not required, however, to accept the opinion of any physician if the opinion is brief, conclusory, and inadequately supported by clinical findings.  *Bray, supra,* citing *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).  *Thomas v. Barnhart* further states:

> Although the treating physician's opinion is given deference, the ALJ may reject the opinion of a treating physician in favor of a conflicting opinion of an examining physician if the ALJ makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.  (internal quotation marks omitted).

*Id.*

The ALJ rejected Dr. Hutchinson's fibromyalgia diagnosis because he did not perform the appropriate tests to support the diagnosis.  The ALJ, instead, adopted the opinion of Dr. Saviers who examined the Plaintiff, palpated the tender points for fibromyalgia, and concluded that Plaintiff's symptoms were not consistent with fibromyalgia.  Based on the record, the ALJ had

1  specific and legitimate reasons for according greater weight to Dr. Saviers' opinion and therefore

2  did not err in rejecting Dr. Hutchinson's fibromyalgia diagnosis.

3      The ALJ did not specifically reject Dr. Hutchinson's diagnosis of disorganized

4  schizophrenia.  The ALJ indicated, instead, that Dr. Hutchinson "suspected" disorganized

5  schizophrenia.  A.R. 26.  The ALJ presumably did not consider this a definite diagnosis.  Dr.

6  Pearson did not mention schizophrenia as a possible diagnosis for Plaintiff's condition.  Nor was it

7  mentioned by any of the other physicians who treated or examined the Plaintiff.  Although Dr.

8  Hutchinson appeared to diagnose disorganized schizophrenia during the office visit on October 23,

9  2009, that diagnosis was brief, conclusory, and not adequately supported by clinical findings.

10  There is no indication that Dr. Hutchinson obtained a psychiatric evaluation of Plaintiff that he

11  stated he would seek during his initial visit with Plaintiff.  The ALJ therefore did not err in not

12  according any weight to this diagnosis.

13      **B.      Whether the ALJ Erred in Concluding that Plaintiff's Medically Determinable**

14  **Impairments Are Not Severe.**

15      The ALJ concluded that Plaintiff has the following nonsevere medically determinable

16  impairment: Cognitive Disorder NOS, Somatoform Disorder, and Alcohol Dependence in recent

17  remission.  The ALJ did not define these impairments in his decision.  For purposes of this decision

18  the Court applies the definitions of cognitive disorder and somatoform disorder set forth in *Johnson*

19  *v. Astrue*, 2012 WL 2049481, *3 (D.Or. 2012), as follows:

20              A non-specific cognitive disorder, however, is not the same as a
              somatoform disorder; a non-specified cognitive disorder is a
21              diagnosis of confusion or memory impairment, whereas a
              somatoform disorder is a diagnosis of a physical affliction from a
22              psychological cause.  *See Herring v. Veterans Admin.,* 1996 WL
              32147, *6 (9th Cir. Jan. 26, 1996) (Table) (a conversion disorder is a
23              "form of a somatoform disorder-a psychiatric syndrome where the
              patient's symptoms suggest medical disease, but no demonstrable
24              pathology accounts for the symptoms"); *Crayton v. Bowen,* 1989 WL
              41721, *3 (9th Cir. Apr. 21, 1989) (Table) ("[s]omatoform disorders,
25              including psychogenic pain disorder, 'present with physical
              symptoms suggesting a disease but for which no organic/physiologic
26              disruption can be found,' " quoting a former version of 20 C.F.R. Pt.
              404, Subpt. P, App. 1, § 12.07); *Dschaak v. Astrue,* 2011 WL
27              4498832, *19–20 (D.Or. Aug. 15, 2011), *adopted by* 2011 WL
              4498835 (D.Or. Sept. 25, 2011) (a cognitive disorder is a "direct
28              physiological effect of a general medical condition" that results in

cognitive impairments similar to dementia, delirium, or an amnestic disorder); *Murphy v. Comm'r Soc. Sec. Admin.,* 423 Fed.Appx. 703, 704–05 (9th Cir.2011) (somatoform disorder can, alone, be the basis of disability).[2]

"An impairment is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  Basic work activities are "abilities and aptitudes necessary to do most jobs," including "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; capacities for seeing, hearing and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting."  20 C.F.R. § 404.1521(b).  The severity of an impairment "must be measured in terms of its effect upon ability to work, not simply in terms of deviation from purely medical standards of bodily perfection or normality."  *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986).  The severity inquiry, however, is "a de minimus screening device to dispose of groundless claims."  *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citations omitted).  An impairment can be found "not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work."  *Id.* (citations omitted).  Even if the ALJ errs in neglecting to list an impairment as "severe" at step two, such an error is harmless if the ALJ considers the limitations posed by the impairment at step four.  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

The ALJ based in his finding of nonsevere impairments in part on his finding that Plaintiff's statements and allegations are less than credible.  The ALJ is responsible for determining credibility and resolving conflicts in medical testimony.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  However, the ALJ's credibility findings must be supported by specific, cogent

---

[2] *See also MedlinePlus, a Service of the U.S. National Library of Medicine, National Institute of Health*, http://www.nlm.nih.gov/medlineplus.  A somatoform pain disorder is generally defined as pain that is severe enough to disrupt a person's everyday life.  The pain is like that of a physical disorder, but no physical cause is found.  The pain is therefore believed to be due to psychological problems.

reasons. *See Rahad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990); *see also Yuckert v. Bowen*, 841 F.2d 303, 307 (9th Cir. 1988). The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995); *see also Dodrill v. Shalala*, 12 F.2d 915, 918 (9th Cir. 1993). In *Molina v. Astrue*, 674 F.3d 1104, 1112-3 (9th Cir. 2011), the court further discusses the credibility assessment as follows:

> In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis. *Vasquez v. Astrue,* 572 F. 3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether there is "'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Lingenfelter v. Astrue,* 504 F.3d 1028, 1036 (9th Cir.2007)). If the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give "'specific, clear and convincing reasons'" in order to reject the claimant's testimony about the severity of the symptoms. *Id.* (quoting *Lingenfelter,* 504 F.3d at 1036). At the same time, the ALJ is not "required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989). In evaluating the claimant's testimony, the ALJ may use "'ordinary techniques of credibility evaluation.'" *Turner,* 613 F.3d at 1224 n. 3 (quoting *Smolen,* 80 F.3d at 1284). For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, *id.*; "'unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment,'" *Tommasetti,* 533 F.3d at 1039 (quoting *Smolen,* 80 F.3d at 1284); and "whether the claimant engages in daily activities inconsistent with the alleged symptoms," *Lingenfelter,* 504 F.3d at 1040. While a claimant need not "'vegetate in a dark room'" in order to be eligible for benefits, *Cooper v. Bowen,* 815 F.2d 557, 561 (9th Cir. 1987) (quoting *Smith v. Califano,* 637 F.2d 968, 971 (3d Cir. 1981)), the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting, *see Morgan v. Comm'r Soc. Sec. Admin.,* 169 F.3d 595, 600 (9th Cir. 1999); *Fair,* 885 F.2d at 603. Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment. *See Turner,* 613 F.3d at 1225; *Valentine,* 574 F.3d at 693.

The credibility determination in this case is rendered somewhat difficult by the finding that Plaintiff has a somatoform pain disorder. While Plaintiff's complaints of severe chronic pain may not be due to any physical illness, disease or condition, they may nevertheless be real to Plaintiff because of his somatoform disorder. Although there are instances in Plaintiff's prior medical

records in which he did not complain about chronic pain and other physical symptoms, there is a relatively consistent pattern of such complaints throughout his medical treatment from June 2001 up through November 2009.[3]  Likewise, the medical providers who interviewed and examined Plaintiff during this period consistently noted that he is a poor historian, has flights of ideas and interrupted thoughts.  This includes Dr. Pearson: "In conversational speech, Darcy was quite vague. He had difficulty at times following the conversational flow and reaching conversational goals. When asked specific questions concerning his personal history, he seemed to struggle to remember places and dates, and he often would loose track of the thread of the conversation and introduce irrelevant information."  A.R. 354-355.

Plaintiff's conflicting statements to medical providers about his alcohol use, sometimes in the same interview, and his conduct in seeking Ativan and later Klonopin medication to deal with his anxiety is also arguably consistent with his psychological disorders.  The ALJ's questioning of Plaintiff's credibility based on his statements and behavior during his interactions with medical providers is therefore debatable.  The ALJ did not necessarily err, however, in finding that Mr. Bursing's claim of *disabling* pain is not credible.  As the ALJ stated, Plaintiff's "ability to perform as a part-time paper delivery person contradicts the severity of physical limitations he has reported."  A.R. 26.  The Court agrees that Plaintiff's testimony that he is unable to walk significant distances, or stand without leaning or holding onto something for support, or sit for more than a half hour, is contrary to the picture of him delivering newspapers from a bicycle two hours a day. Although working two hours a day delivering newspapers does not constitute substantial gainful activity, it is some evidence that the Plaintiff has the ability to perform entry level work tasks. Plaintiff also testified that he was able to perform activities of daily living such as personal grooming, household chores and grocery shopping, albeit with great difficulty.

. . .

_____

[3] There are two separate periods of gaps in treatment: September 2005 to August 2006 and April 2007 to March 2009.  It is unknown whether medical records for these periods were simply not included in the record or whether Plaintiff did not receive medical treatment during those periods.

The ALJ also based his conclusion that Plaintiff's cognitive impairments are not severe on Dr. Pearson's statements that Plaintiff scored 29 out of 30 on the Mini-Mental Status Examination and had only "mild difficulty in his concentration, persistence, and pace secondary to his preoccupation with his alleged physical discomfort." A.R. 25.  As Plaintiff's counsel has pointed out, Dr. Pearson actually stated that Plaintiff "would probably experience mild to moderate problems with pace, persistent and concentration because of his preoccupation with physical discomfort." (Emphasis added.)  A.R. 355.  Dr. Pearson also stated that Plaintiff would have mild problems understanding and remembering instructions in an entry level work environment.  Id.

Plaintiff's counsel argues that the ALJ failed to consider Dr. Pearson's statement that while the Mini-Mental State Examination did not reveal significant neurocognitive impairment, it was highly unlikely that Plaintiff was deliberately faking his weak memory and confused illogical verbalizations during the examination.  Dr. Pearson stated that a neuropsychological assessment would be required to address Plaintiff's current cognitive status comprehensively.  Plaintiff argues that the ALJ should have ordered the neuropsychological evaluation rather than reach the conclusion that his cognitive disorder was nonsevere.

The Commissioner has broad latitude in deciding whether to order a consultive examination.  *Reed v. Massanari*, 270 F.3d 838, 842, (9th Cir. 2001), citing *Diaz v. Sec'y of Health and Human Servs.*, 898 F.2d 774, 778 (10th Cir. 1990) and 20 C.F.R. § 404.1517-1519t, 416.917-919t.  "Some kinds of cases, however, do normally require a consultive examination, including those in which additional evidence needed is not contained in the records of [the claimant's] medical sources, and those involving an 'ambiguity or insufficiency in the evidence [that] must be resolved."  *Reed*, 270 F.3d at 842 (internal quotation marks and citations omitted).  *Reed* further quoted *Carrillo Marin v. Sec'y of Health and Human Services*, 758 F.2d 14, 17 (1st Cir. 1986) that if the Secretary is doubtful as to the severity of the claimant's disorder, then the appropriate course is to request a consultive evaluation.  The court further stated that the failure to do so can constitute good cause for remand.  *Id.*

Based on the hypothetical posed by the ALJ at the hearing and testimony of the vocational expert, it appears that Plaintiff is not capable of performing his past relevant work as a

23

housekeeping cleaner due to his physical limitations. A.R. 69-70. The vocational expert testified, however, that Plaintiff would have the physical capacity to perform light duty jobs such as information clerk, office helper, or assembler of small products. The question is whether Plaintiff's cognitive disorder or somatoform disorder would prevent him from performing such jobs because of his inability to follow instructions or engage in adequate reasoning, or because of his preoccupation with pain and other symptoms resulting from his somatoform disorder. A consultive neuropsychological assessment regarding Plaintiff's cognitive status, as suggested by Dr. Pearson, appears relevant to the determination of whether Plaintiff is able to perform light duty or sedentary jobs such as the vocation expert testified he would be capable of doing based on his physical limitations.

**CONCLUSION**

Based on the fairly lenient standard for characterizing medically determinable impairments as severe, the Court finds that the ALJ erred, at the second step of the sequential evaluation process, in concluding that Plaintiff's impairments were not severe and that he was not disabled. Because the ALJ did not continue on to evaluate Plaintiff's residual functional capacity and determine whether he was capable of performing his past relevant work or other kinds of work, at the fourth and fifth steps of the sequential process, Plaintiff's application for Social Security disability benefits should be remanded for further hearing and consideration. On remand, the Commissioner should also obtain and consider a consultive neuropsychological assessment regarding Plaintiff's cognitive status. Accordingly,

**RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Remand (#12) be **granted** and that this case be remanded to the Commissioner of Social Security to obtain a consultive neuropsychological assessment of the Plaintiff and for the Commissioner to determine whether Plaintiff is able to perform light duty or sedentary work in light of his medically determinable impairments.

**IT IS FURTHER RECOMMENDED** that Defendant's Cross-Motion for Summary Judgment (#17) be **denied**.

1

**NOTICE**

2    Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be

3 in writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has

4 held that the courts of appeal may determine that an appeal has been waived due to the failure to

5 file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit

6 has also held that (1) failure to file objections within the specified time and (2) failure to properly

7 address and brief the objectionable issues waives the right to appeal the District Court's order

8 and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153,

9 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

10    DATED this 4th day of March, 2013.

11

12

13    GEORGE FOLEY, JR.
      United States Magistrate Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28